```
             UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        :
                                :
         vs.                    :  No. 4:CR-01-0384
                                :
ERIC SHIELDS                    :  (Judge Muir)
```

**OPINION**

MUIR, District Judge

       I. Introduction.

  On December 5, 2001, a Grand Jury sitting in the Middle District of Pennsylvania returned a one-count Indictment charging Eric Shields with possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2). On February 27, 2002, Shields entered a plea of guilty to the Indictment. By order of February 28, 2002, the court directed that a presentence report be prepared and scheduled a presentence conference for May 30, 2002. However, because of certain problems associated with the case which we have detailed in prior orders and will not be repeated in this opinion the presentence conference was continued several times.

  A presentence report and addendum thereto were prepared and submitted to the court on May 13, 2004. Probation Officer Drew Thompson determined that the total offense level is 18, the criminal history category is I and the guideline imprisonment range is 27 to 33 months. Shields filed a motion for downward departure which became ripe for disposition on November 15, 2004. On November 30, 2004, we issued an opinion and order resolving

Shields's motion for downward departure. That opinion and order set a guideline imprisonment range of 10 to 16 months.

On December 9, 2004, the Government requested an evidentiary hearing on Shields's objection to paragraph 13 of the presentence report relating to the number of images possessed by Shields. Based on that request a hearing was scheduled for January 24, 2005. On January 18, 2005, Shields withdrew the objections to paragraph 13 and filed a motion to cancel the evidentiary hearing. On January 19, 2005, an order was issued canceling the evidentiary hearing. On April 4, 2005, we issued an order scheduling sentencing for May 5, 2005.

On May 4, 2005, Probation Officer Eric W. Noll filed a bail violation report. In that report Mr. Noll stated that he had conducted an unannounced home visit on May 3, 2005, at the residence of Shields. During that visit Mr. Noll discovered that Mr. Shields was in possession of several pornographic, sexually oriented or sexually stimulating Digital Video Discs (DVDs). A condition of Shields's pretrial supervision was that he "not possess any pornographic, sexually oriented, sexually stimulating material in any media, including, but not limited to, visual, auditory, telephonic, written, or electronic media, to include computer programs or services[.]"

Shields appeared before the court for sentencing on May 5, 2005. At that time Shields took the position that the bail violation report was not relevant to sentencing and that he had not violated the conditions of his pretrial release. Government

counsel contested that assertion.  In light of the dispute as to the facts as to the alleged bail violation we issued an order scheduling a hearing for May 13, 2005, to determine whether or not Shields violated the conditions of his bail supervision. At the hearing held on May 13, 2005, Shields admitted that he violated the conditions of his release on bail and the court issued an order revoking his bail supervision and directed that he surrender to the United States Marshal in Williamsport on May 23, 2005, for detention pending sentencing.  The court also scheduled a hearing for June 6, 2005, to determine whether or not Shields's violation of the conditions of his bail supervision would require the court to consider reassessing its evaluation of Shields's post-offense rehabilitative efforts and Shields's entitlement to a 3-level downward adjustment for acceptance of responsibility.  A hearing was held on June 6th as scheduled. The following are the court's findings of fact, discussion and conclusions of law.

II.  Findings of Fact.

1. Shields was initially arraigned on the charge set forth in the Indictment on January 16, 2002, and released subject to pre-trial services supervision. (Undisputed, hereinafter "U")

2.  As part of this supervision a Probation Officer conducted an unannounced home visit at Shields's residence on January 30, 2002 and discovered papers which contained stories about young children having sexual relations. (U)

3. As a result of this discovery a bail violation report was prepared, and a hearing was set on this alleged violation by the Court. (U)

4. On February 5, 2002, after the start of the hearing the parties reached an agreement on amended conditions of pretrial supervision for Shields, conditions which, in pertinent part, provided that: "Defendant shall not possess any . . . sexually oriented . . . material in any media . . . ." (U)

5. As part of Shields's on-going pre-trial supervision on May 3, 2005, at approximately 6:05 p.m. the Probation Officer conducted an unannounced home visit at Shields's residence.

6. Upon arrival at the residence, the probation officer knocked on the door but Shields did not answer. (U)

7. When he received no answer the Probation Officer left the residence in his automobile but observed Shields's car parked near the home. (U)

8. The Probation Officer then called Shields's residence by telephone at 6:13 p.m. (U)

9. Shields stated in response to this telephone call that he had been sleeping and agreed to meet the Probation Officer and let the Probation Officer into his home. (U)

10. The Probation Officer arrived at the door of Shields's home at 6:16 p.m., but Shields did not open the door to his home until 6:22 p.m. (U)

11. When questioned about the delay, Shields stated that he had been getting dressed, although he was clad simply in

sweat pants and sandals when he opened the door to the residence. (U)

12. During a tour of the home, the Probation Officer observed digital video disks (DVDs) in the living room on a shelf. (U)

13. One of the DVD boxes was entitled "Uncensored Caught on Campus," the other DVD box was labeled "Lost Reality." (U)

14. The Probation Officer observed that both DVDs appeared to contain sexually oriented materials, including displays of nudity. (U)

15. When questioned regarding the DVDs, Shields admitted possessing the DVDs, and stated that they had been given to him by a friend and that he had viewed the DVDs on one occasion. (U)

16. Probation Officer Eric Noll did not confiscate the DVDs. (U)

17. "Uncensored Caught on Campus" consists of three DVDs, which contain a total of 27 video clips with an average running time of approximately 5 minutes each. (U)

18. At least seven of these video clips – Halloween Riot1, Ballpark Hijinx, Eye in the Sky, Campus Girls, Sin City 2, Bachelor Party 1, and Bachelor Party 2 – contain "sexually oriented . . . material" including images of women exposing their breasts, displays of nudity, episodes of sexual foreplay, and

depictions of couples engaging in, or simulating, sexual intercourse.  (U)

      19. "Lost Reality" consists of a single DVD, which contains 13 video clips, which each average approximately 5 minutes in length.  (U)

      20.  At least six of these video clips – He Said/She Said, Dying Dave, Casting Couch, Caught Stealing, The Whore, and American Porn Star – contain "sexually oriented . . . material."  (U)

      21.  These video clips display nudity; depict a naked transgender individual, who displays both male and female sexual characteristics; displays strippers; depict a man defecating on a table; contains photos of nude women; show an episode in which a man steals dildos; contain depictions of individuals engaging in, or simulating, sexual intercourse in a public restroom at a restaurant, in a parked automobile, and in a public parking lot; and show women competing to be stars in pornographic films, by engaging in masturbation, and simulating oral and vaginal sex.  (U)

      22. The DVDs do not contain child pornography. (U)

      23. Dr. Foley testified that the DVDs in question are readily available to the general public at Blockbuster, Amazon.com and retail outlets. (U)

      24.  In preparation for the June 6th hearing, Shields was reevaluated by Timothy Foley, Ph.D., on May 19, 2005, and Dr. Foley prepared a report of this evaluation on May 27, 2005, (U)

25. In the report, and in his testimony at the June 6th hearing, Dr. Foley repeated his prior findings that Shields had engaged in extraordinary post-offense rehabilitation, but stated that:

> 25.1. Eric Shields possessed the sexually oriented materials found on the DVDs discovered at his home for 6 to 12 months prior to their discovery by the probation officer in May 2005;
>
> 25.2. Shields failed to disclose his possession of this sexually oriented material to Dr. Foley prior to its discovery by the probation officer in May 2005;
>
> 25.3. Shields did not disclose his possession of this sexually oriented material to his therapist Genelle Sweetser prior to its discovery by the probation officer in May 2005.
>
> 25.4. Shields did not disclose his possession of this sexually oriented material to his support group the Sex and Love Addicts Anonymous prior to its discovery by the probation officer in May 2005;

(U)

26. Dr. Foley acknowledged that candor with therapists and support groups is an important part of the rehabilitation process. (U)

27. Dr. Foley stated that Shields possessed this sexually oriented material intentionally, and not by accident. (U)

28. Dr. Foley acknowledged that possession of this material violated Shields's bail conditions. (U)

29. Dr. Foley stated that Shields recalled a sexual motivation for possessing and viewing this sexually oriented material, but Shields told Dr. Foley that he did not find them sexually stimulating. (U)

30. Dr. Foley stated that Shields admits to occasional masturbatory fantasies associated with adolescent girls. (U)

31. Dr. Foley stated that Shields also admitted that, from time to time, Shields notices pre-pubescent girls in a shopping center that he finds sexually attractive. (U)

32. Dr. Foley stated that Shields's conduct in terms of possessing sexually oriented materials constituted a "slip" in terms of his treatment and rehabilitation and that pedophiles commonly experience slips of this type. (U)

33. Dr. Foley stated that Shields's sexual fantasies and thoughts regarding pubescent and pre-pubescent girls are also common. (U)

34. Eric Shields has continued group and individual psychotherapy with Genelle Sweetser, LCSW. (U)

35. Eric Shields attends individual sessions every other week and group meetings on alternating weeks. (U)

36. Eric Shields attends one to four Sex and Love Addicts Anonymous (SLAA) meetings each week (U)

37. In April, 2005, counsel for Eric Shields requested that he again document his attendance at SLAA. (U)

38. From the time that counsel again requested verification forms, Eric Shields attended SLAA meetings on the following dates; April 4, 2005, April 6, 2005: April 14, 2005; April 20, 2005; April 25, 2005; April 27, 2005; April 28, 2005; May 4, 2005; and May 11, 2005. (U)

39. According to Dr. Foley, Eric Shields understands that viewing child pornography would constitute a "relapse." (U)

40. According to Dr. Foley, Eric Shields used his SLAA group to strengthen his relapse prevention and to help others with their plans. (U).

41. Dr. Foley testified that the possession of the DVDs which contained sexually oriented material constituted a "lapse" rather than a "relapse."

42. Dr. Foley testified that possession of the DVDs in question was not a relapse because there were no children or child pornography depicted in the DVDs. (U)

43. Dr. Foley testified that despite Eric Shields's possession of DVDs, portions of which contain sexually oriented material, he continues to be of the view that Eric Shields has made extraordinary gains and outstanding progress in his post-offense rehabilitative efforts given the extent of his obsession with child pornography prior to his arrest in November, 2001. (U)

44. Dr. Foley is an expert in the treatment and diagnoses of sexual disorders. (U)

45. Genelle Sweetser has been Eric Shields's individual and group therapist for three (3) years. (U)

46, According to Genelle Sweetser, over the past three years Eric Shields has learned about his addiction, learned to use a support system in his continued recovery and has worked hard on his recovery. (U)

47. After the discovery of the DVDs in question, Eric Shields advised Genelle Sweetser of his violation. (U)

48. According to Genelle Sweetser, Eric Shields was remorseful, accountable for his behavior and showed a degree of maturity, recovery and accountability that was not present three years ago.

49. Also according to Genelle Sweetser, Eric Shields has learned to accept responsibility for his behavior. (U)

50. Dr. Foley testified that he agreed with Genelle Sweetser's assessment of Eric Shields. (U)

51. Dr. Foley testified that despite his violation behavior Eric Shields continues to demonstrate extraordinary post-offense rehabilitation progress. (U)

52. Dr. Foley testified despite Shields's violation behavior, he continues to agree with this court's opinion of November 30, 2004, in which we stated that "...Shields's rehabilitation efforts are extraordinary and commenced shortly after his arrest; and that those efforts have been remarkable, thorough, successful thus far, possibly unique, and undertaken with the primary goal of treating his psychiatric and neurological conditions." (Opinion filed November 30, 2004, p. 27) (U)

53. Dr. Foley testified that despite Shields's violation behavior, he stands by the statement he made on May 23, 2004, that "[g]iven the longstanding existence of multiple paraphilias, Mr. Shields's response to treatment has been exceptional." (U)

54. The court incorporates by reference the findings of fact set forth in Part II of our opinion of November 30, 2004.

### III. Discussion.

There are two issues which the court must decide. First, whether or not we should revoke the 3-level downward adjustment in Shields's offense level for acceptance of responsibility. Second, whether or not we should revoke the 4-level downward departure in Shields's offense level for extraordinary post-offense rehabilitative efforts. We will address those issues in that order.

Section 3E1.1 of the Sentencing Guidelines provides in relevant part as follows:

> (a)  If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

An additional decrease of one level is warranted if the defendant's total offense level is 16 or higher and the defendant timely provided complete information to the government concerning his involvement in the offense or timely notified authorities of his intention to enter a plea of guilty.  In this case Shields's total offense level was 18 and he did provide complete

information to the government concerning his involvement in the offense and timely notified authorities of his intention to enter a plea of guilty.

Application Note 1 to § 3E1.1 sets forth several items that we may consider when determining whether Shields is entitled to a 3-level reduction for acceptance of responsibility, including, truthfully admitting the conduct comprising the offense, voluntary termination or withdrawal from criminal conduct or associations, and post-rehabilitative efforts such as counseling or drug treatment.  Application Note 3 states that the evidence of acceptance of responsibility "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility."

The Government relies on the case of United States v. Ceccarani, 98 F.3d 126, 129-30 (3d Cir. 1996) in support of its position that Shields is not entitled to a three-level downward adjustment for acceptance of responsibility.  In Ceccarani the Court of Appeals for this circuit held that a sentencing judge may in the exercise of his discretion consider unlawful conduct committed by a defendant while awaiting sentencing in determining whether or not the court should grant a reduction in the offense level for acceptance of responsibility.  98 F.3d at 131.  The Court of Appeals further noted that "post-offense conduct can shed significant light on the genuineness of a defendant's claimed remorse." 98 F.3d at 129.

Based on the Findings of Fact set forth in our opinion of November 30, 2004, and in Part II of this opinion, we are satisfied that Shields is entitled to a 3-level downward adjustment for acceptance of responsibility.  Shields timely notified the authorities of his desire to plead guilty and provided complete information regarding his involvement in the offense.

We will now address the issue of whether Shields is entitled to a downward departure for extraordinary post-offense rehabilitative efforts.  In our opinion of November 30, 2004, we granted Shields a downward departure for such efforts.  Based on the findings of fact set forth in our opinion of November 30, 2004, and in Part II of this opinion, we conclude that Shields has engaged in extraordinary post-offense rehabilitative efforts. However, because of the new information presented at the hearing on June 6th we are not convinced that a 4-level downward departure is warranted for those efforts.  Shields committed a bail violation.  Furthermore, he engaged in secretive behavior by failing to disclose his possession of the DVDs to Dr. Foley and Genelle Sweetser until after the DVDs were discovered by Probation Officer Noll.

In granting Shields a 4-level downward departure we relied on our opinion issued on April 2, 2004, in United States v. Robert D. Gift, Criminal No. 4:CR-02-0051 (M.D. Pa. filed Feb. 22, 2002). We granted Gift a 4-level downward departure for extraordinary post-offense rehabilitative efforts.

At the time we issued our opinion of November 30, 2004, we considered the post-offense rehabilitative efforts of Shields to be similar to those of Gift. Gift did, however, take rehabilitative steps that went beyond those of Shields. Gift voluntarily admitted himself to inpatient treatment at the Keystone Center Extended Care Unit for Healing from Sexual Compulsivity and Trauma. Gift's health insurance did not cover the treatment costs. Gift sold his home and used the equity to pay $10,100.00 for his treatment at Keystone. We recognize that Shields explored the possibility of an inpatient program and found the costs of the program beyond his economic means. See Opinion of November 30, 2004, Finding of Fact 77.

In light of Shields's bail violation and secretive behavior, the comparison between the rehabilitative efforts of Gift and Shields is not appropriate because Gift did not commit a bail violation or engage in secretive behavior.

There is no doubt that Shields has engaged in extraordinary post-offense rehabilitative efforts warranting a downward departure. However, the extent of the departure granted by our opinion and order of November 30, 2005, is in question. In United States v. Kikumura, 918 F.2d 1084 (3d Cir. 1990), the Court of Appeals concluded that in certain cases provisions of the guidelines themselves may suggest an analogy from which to determine the appropriate level of departure. In <u>Kikumura</u> the Court of Appeals also stated that "district courts are entitled to 'a substantial amount of discretion' in determining the extent

14

of any departure." Id. at 1110 (quoting United States v. Ryan, 866 F.2d 604, 610 (3d Cir. 1989)).

In this case, the acceptance of responsibility guideline gives us some framework in which to gauge the extent of a departure for extraordinary post-offense rehabilitative efforts. The most that a defendant can receive for acceptance of responsibility is a 3-level downward adjustment.

There is no doubt that Shields has engaged in extraordinary post-offense rehabilitative efforts. However, under the circumstances of this case, those efforts only warrant a downward departure of 2 levels.

### IV. Recapitulation.

| | |
|---|---|
| Total Offense Level as per Presentence Report: | 18 |
| Subtract 2 levels for downward departure pursuant to U.S.S.G. § 5K2.13 because of Shields's diminished capacity (See Opinion of November 30, 2004): | (2) |
| Subtract 2 levels for Shields's extraordinary post-offense rehabilitation: | (2) |
| Revised Total Offense Level: | 14 |

### IV. Conclusions of Law.

1. Shields's post-offense rehabilitation efforts and results are sufficiently extraordinary to justify a 2-level downward departure.

2. Shields's advisory guideline imprisonment range is 15 to 21 months.

      3.   Shields's advisory fine range is $4,000.00 to $40,000.00.

      An appropriate order will be entered.

                                      _____
                                      MUIR, U.S. District Judge

DATE: June 17, 2005

MM:gs

```
              UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA       :
                               :
         vs.                   :   No. 4:CR-01-0384
                               :
ERIC SHIELDS                   :   (Judge Muir)
```

**ORDER**

June 17, 2005

     1. Shields's advisory guideline imprisonment range is 15 to 21 months.

     2. Shields's advisory fine range is $4,000.00 to $40,000.00.

     3. Sentence will be imposed on Shields in Courtroom No. 1, Williamsport, at 4:15 p.m. on July 15, 2005.

```
                              s/Malcolm Muir
                              MUIR, U.S. District Judge
```

MM:gs